This case is 517-0455 Meyer v. Workers' Compensation Commission. Thank you. Counsel, you may proceed. Good morning. May it please the Court, my name is Michele Rich. I represent Sammy Meyer in this case, the claimant and the appellant. Obviously, the issues in play today, as I'm sure you know, is somewhat of an unfortunate case in terms of what ended up happening to my client in terms of her medical care and treatment. She ultimately had her leg amputated seven inches below the knee, as I'm sure you know from reading the medical records. That's only somewhat unfortunate? Extremely unfortunate, yes. So the Commission's decision in this case is against the manifest weight of the evidence for several different reasons. I'd like to start with accident. And we know that the manifest weight of the evidence standard is difficult, but what the case law says is that the Commission's decision can't be based on speculation and conjecture, as you know. And when you look at the facts of the case, there just simply isn't enough evidence to support what the Commission decided in this case. So with respect to accident, my client's a meat stocker for Walmart. She has to go into a dark, cold room to get supplies of meat that are located in that room. In that room, which she said was dimly lit, and she testified that she slipped on a piece of paper, rolled her ankle, and fell, injuring the medial side of her right ankle. So what the Commission indicated in its decision was that they did not find my client's testimony that she slipped on a piece of paper in the meat locker to be credible or persuasive. The problem with that is that no one from respondent, Walmart, ever appeared to contradict what she testified to. Let me ask you about that. I mean, you're making a good point, but it appears the Commission, I don't know that I would agree, ignored her testimony and found her not credible. And the reason it found her not credible is because there was nothing to substantiate it. To the contrary, on the date of the accident, tell me if this is true, the evidence was the claimant signed a report stating she just fell down. She did not slip. She just felt herself falling. She doesn't think anything was on the floor. Likewise, at the emergency room on the date of the accident, the claimant reported that she was working and fell and denied slipping on anything, and that she denied twice slipping on anything. Is that in the records? In terms of the incident report, you correctly summarized the incident report, Your Honor, but I think what the Commission failed to recognize in its decision was that my client testified she didn't complete that form. And she even, in fact, said that she had to correct the supervisor and stop her because she was putting things in there that weren't true. And she gave us the name of this person, Janice, and Janice was never present at the time of trial to testify. So what we have is an incident report that was not completed by my client, which I think you can probably all appreciate from the record. My client is an extremely simple person. She works for Walmart in the meat stocking department. Assuming that that's absolutely 100% true, according to this, and this is really what is critical, did she sign the report, though? Did she, in fact, sign the report irrespective of who prepared it, saying that she did not slip on anything? She admits that she signed it. I don't think that that should be held against her, some sort of admission. Well, if somebody signs something saying this is true, do we ignore that? Does the Commission just ignore that and say, oh, she must have meant something else, it was a mistake? Well, they completely ignored her testimony, though, Your Honor, that, again, she didn't sign this and she didn't agree. I mean, excuse me, she did sign it. She did sign it. And she unequivocally said, each time she was asked, and the arbitrator even asked her, if you read the record, what did you slip on? I slipped on a piece of paper. But here's the problem with that. We don't weigh the credibility of the witnesses, as you well know. That's the Commission's. And while she may have an explanation, perhaps even legitimate, as to why she signed it, the fact is it's in the record and she signed it. We can't substitute our judgment for that of the Commission. Could we say, no, that's all wrong, the Commission got it wrong, she has an explanation, therefore the Commission should have believed her. Can we actually do that? I think that you have the ability to overturn the Commission's decision when it's based on speculation and conjecture. But where's the speculation? She signed the report. I'm sorry, Your Honor? She signed the report herself. Where's the speculation? She signed the report, but she testified to something different at the time of The other thing with regard to accident that I want to point out to you is that even supposing that my client didn't slip on a piece of paper, this case should still have been found compensable by the Commission because she testified that this area was poorly lit. And that is a hazard that the appellate court has specifically found in the past to constitute a hazard that's compensable under the Act. She testified that the room was dimly lit, she couldn't see, and in Carletta actually argued and won at the appellate court, they held that poor lighting constitutes a hazard. Did she ever mention poor lighting in any of the documentation, which I think was the other problem the Commission had? She may have testified to it, but apparently from the accident report she never said anything about dim lighting. Is that true? It's not in the medical records. It's not in the incident report. So I grant you that. But as we all know, not every single detail is always contained in these medical records. That's true. I think we have to be in all fairness, that is true. And that's a frequent argument. It's a legitimate argument. But again, when we're talking about manifest weight, we still have to take the record as it exists. Right. You're giving us explanations why it shouldn't carry the day, but it still exists. Well, the problem is, Your Honor, the Commission completely ignored that case and that legal theory. They didn't mention it at all in their decision. They didn't say that they didn't find that my client, or that the lighting was bad and that didn't constitute a hazard. They basically just ignored it. And that was improper for them to do in this case, because it's clear from the evidence. She said at the time of trial, and this was unrebutted, nobody from Walmart came in and said that the lighting was good. And in the Carletta Roads case, they even had somebody come in and say that the lighting was good. And the appellate court still found that the petitioner was credible and that that constituted a hazard. And that was in a parking lot. This is on premises, poor lighting, unrebutted testimony. The case law says that that constitutes a hazard. Unrebutted testimony of the poor lighting or what? Yes, of the poor lighting. Well, can't the other side respond to the fact that she never mentioned that one in the reports when she was interviewed following the accident? That's not the absence of that isn't somewhat impeaching? Well, it wasn't mentioned in the Carletta Roads case. All right. What about the doctors? Okay. Commission agreed with the arbitrator and found the opinion of Dr. Krause to be more persuasive than the opinion of your doctor, Dr. Creed. Correct? That's what they said. So where did they err in doing that? Well, if you look at not only Dr. Krause's qualifications, but what he actually relied on and his opinions, he is an orthopedic specialist. So this is something that is more within the realm of a vascular specialist, which Dr. Creed was. He's the one who actually did the surgeries on my client. Dr. Krause did not see my client, never examined her. His testimony suggests that he didn't even have all the medical records at the time that he authored his report or gave a deposition in this case. And what did he say? He said, and his opinion is essentially that there must have been something else that happened to my client in the meantime. She must have rubbed her ankle on something to cause this ulcer to develop, which became infected, which required the amputation. The problem with that is that there's no evidence of that. There's no evidence of anything else happening to my client other than this injury that  Well, didn't she have some other health issues that could provide an explanation? Didn't she have some other health issues? She had diabetes that predisposed her to developing some of those things, Your Honor. But the only thing that we have in this case is evidence of an injury to her. And the medical records, while they're not perfect in terms of the consistently presented to doctors following this injury for problems that progressively got worse. And for Dr. Krause to say that there must have been something else that happened in between that she just didn't know about that's not reflected anywhere, that's against the manifest way to the evidence. Commission agreed with Dr. Krause, did they not, that she was at MMI as of August 1st, 2011. And they agreed with him that there was no indication of any break in the skin whatsoever. That was the ultimate reason she unfortunately and tragically lost a limb was because there had to be an infection. In Krause's time, clearly there was no infection existing at that time. Well, I'm sorry. I didn't mean to cut you off. No, but that's what Krause's testimony was. That's what he says. But again, I don't think that that is credible or persuasive. And I would point you to Dr. Preeb's testimony. It's actually page 15 of his deposition. He talks about why he believes this happened. He says that he believed that she had a severe sprain. That severe sprain may have led to internal bleeding, a collection of fluid, and then later on became infected. So he explained exactly how he believed that it happened. And significantly, as I mentioned, he's the one who saw this lady and ultimately did the surgeries on her. Well, more to the point, I suppose, rather than belabor it, you know, you're doing a pretty good job of marshaling your arguments and answering some of the questions on the other side. But at the end of the day, even if you can explain everything, we still would have to conclude to reverse that an opposite conclusion is clearly apparent. Well, Lafayette's side has their witnesses and experts. You have yours. So why is an opposite conclusion clearly apparent? An opposite conclusion is clearly apparent, Your Honor, because you mentioned respondent had witnesses. They didn't have any witnesses. They shouldn't have any witnesses. They got the doctor. Yes. They had an expert. And they had the medical records, correct, that impeached her? They had medical records that were not perfect but supported that my client was injured at work and then developed a problem. And that problem continued to get worse over a period of time. So I think this case is actually analogous to CISPRO. I cited that in my brief. And I think that that stands for the proposition that just because a doctor says that something else could have caused that condition to develop, if you have evidence that it did or contributed to it, then that's a compensable claim. And that's essentially what Dr. Krause was trying to say and why I think the Commission's decision is wrong is because he's saying, well, I think that something else could have happened in between. But we don't have any evidence of that. Well, let's explore that for a second and give your argument due respect. Something else would have had to happen. How could he be wrong? If he's saying, I conclude, based on all my examination, there was no break in the skin, there was no blister, if that's accurate, something else would have had to have led to this infection, correct? If you believe what he says, then yes. But I don't think that that opinion is supported by the evidence and it's not credible based on what Dr. Preeb says, who's an expert. And he's the one who has been treating my client. And he says, I read it to you before, so I don't want to read it again necessarily, but he described how it happened. And we don't have anything else that happened to her in the meantime to explain that. The MRI, I think, is also significant because if you look at the MRI, it says that she actually had a potential or possible rupture of her Achilles tendon. And that shows that she had a pretty bad sprain strain. And that's what Dr. Preeb says, is a severe sprain can lead to this sort of problem. And yes, she's predisposed to it because she has diabetes, but that's exactly what CISPRO says. We can't penalize somebody because they have a preexisting condition. We have to take them as we find them. And this lady had been working for Walmart, had no issues like the one that ultimately she ended up having. All we have is this unbroken chain of events from the injury to ultimately what happened to her having to have her leg amputated. Ironically enough, didn't Dr. Preeb sort of say something that could have been used to support the other side? Did he opine that given the claimants preexisting condition of diabetes and peripheral vascular disease, neuropathy started her down the path towards infection? Didn't he say, didn't he provide indication of what could have happened? Her own doctor? I think what he was saying, that she was predisposed to that because of the fact that she was diabetic. True. So no one's denying that that's a factor here. I think if she was a healthy person without diabetes, I don't think this probably would have happened to her. But under the law, that doesn't matter. As long as I can show and say that her injury was a factor, the law says that that's a compensable claim. It was a cause, but that's where we're going back and forth because they believe, Krauss, there was no break in the skin. This fall could not have created any condition that led to the amputation. That's Krauss' opinion in a nutshell, isn't it? That's what he says. That's what he says. He says he's not believable, but that's what he says. That's what he says, and I don't think he's believable for the reasons that we've talked about. So I don't want to belabor the point too badly. With respect to the medical records, you made a couple of points about the records, Your Honor, and what I would point you to is a case I cited in my case says that, oh, I see my time has expired. Well, finish your thought, right? When you finish, you'll have time to reply as well. So if you want to finish your thought. Sure. So I would just say that that case says that Sorry, which case? The Ferris case. Thank you. Your Honor, that case stands for the proposition that just because medical records don't directly mirror a claimant's testimony, that doesn't mean that a work injury, a compensable work injury doesn't occur. So I would note that for you with respect to the medical records. I'm sorry, was there another question? I don't think there is. Okay. Thank you. You'll have time to reply. Thank you. Counsel may respond. Good morning, Your Honors. Please support counsel. Michelle Lafayette on behalf of Walmart. I think, Justice Hudson, you hit on the crux of the issue here, which is manifest rate of the evidence and credibility in the role of the commission. And I'm going to start with the accident issue. And I would point out that there are two pieces of evidence the commission looked to in finding Ms. Meyer to be not credible. The first was that associate statement that she acknowledged she signed. And there's an acknowledgement when she signed it that the representations are true and correct. She had an obligation to take that as a true and correct representation of what occurred on that day. The second piece of evidence, which I note Ms. Meyer did not address in her brief, either in the statement of facts or in the argument, were the records from St. Elizabeth Hospital on June 28, 2011. And that's the date of the injury. And that's the first place she went for treatment. And in those records she denies that she fell on anything or that there was anything on the floor that caused her to fall. It's not until Dr. Preeb is deposed in 2013 and a hypothetical question is posed to Dr. Preeb by Ms. Meyer's attorney that this idea that there was a piece of paper on the floor is introduced into the case. That's the first time it arose, in the hypothetical? Is in the hypothetical, during Dr. Preeb's deposition on May 9, 2013. And it then also becomes her testimony when the case proceeds to trial in 2015. So the commission was well within its providence to judge Ms. Meyer's testimony. And that history is contradicted by evidence that's created contemporaneous to the date of injury. I would argue that Ferris is also not applicable here. In Ferris, the claimant did not say there was never a defect in the premises. There was some distinction in how he described it throughout the medical record. So it's different than here where she denies a defect. And I cited the Bill, the Baldwin, the first financial and the Stapleton cases. And in those cases, they're more analogous to what we have going on here. For example, in Bill, the claimant testified she caught her foot in a crack in the parking lot, which would be a defect. The commission rejects her testimony noting there was no mention of a crack in the payment in the medical records or when she was interviewed by the supervisor. That's very similar to what we have here. And there was a finding of no accident. And the same sets of facts are then present in the other three cases we have cited. As for the lighting argument, I think the commission views that in the same way and doesn't really find it to be a factor of creating a defect because it's something that comes up for the first time at trial. It's not even part of the hypothetical that's presented to Dr. Breve. So the commission was well within its prevalence and its authority to find her overall not credible and that there was no accident that arose out of and in the course and scope of her employment on June 28, 2011. As for the causal connection issue, you really have to look at the timeline of events. You've got the accidental injury on June 28, 2011 and at St. Elizabeth Hospital, they note no open wound. There is some swelling of the ankle and we don't dispute that she has an ankle sprain at that point in time. July 7, 2011, she sees her family physician or a doctor through the family practice that she goes to, Dr. Kim. He notes pain and swelling and recommends she see an orthopedic physician. At this point, there's no recommendation that she continue use of an air cast she had been given at the emergency room. July 18, 2011, she sees Dr. Kearney and she's diagnosed with a deep vein thrombosis, but again, there's still no mention of an open wound. The most significant record for the analysis is the August 1, 2011 evaluation by Dr. Hidalgo. On August 1, Dr. Hidalgo notes minimal ankle swelling bilaterally, no associated redness, warmth, or leg pain, and he releases her to return back to work. So as of August 1, 2011, when the commission finds her to be at maximum medical improvement, there is absolutely no mention of this ulceration or blister on her heel. And the commission finds that significant and they find that significant because August 12, 2011, she suddenly has the blister and that goes into the doctor's testimony. Does the commission find Dr. Preber, Dr. Krause more credible? And they find Dr. Krause more credible for several reasons. One, they're looking at his explanation of you have to have an open wound for the bacteria to get into the system to cause the infection. And on August 1, as Dr. Krause notes, there's no open wound noted by Dr. Hidalgo. This woman has uncontrolled diabetes. So it wasn't just Krause, it was the other doctor that said there was no open wound. And he examined both of her feet on that day. It's in his chart. That corroborates Krause. That corroborates Krause, exactly. I would also point out that Dr. Preber, when he's questioned on cross-examination, he's asked about, when asked whether it is normal for an internal ankle sprain to develop into an ulcer, his response is, quote, well, I'm not sure because it depends on how severe is that sprain. Severe sprain may have internal bleeding, collection of fluid, and then later on become infected. So I don't know how severe it was initially because I didn't see her at that time. And that can be found at 698 in the record. Dr. Krause never reviewed the records of care provided to her before she came under his care in September of 2011. He had no idea how severe this ankle sprain was or what the state of her condition was before that. And the commission picked up on that when they found Dr. Krause more credible than Dr. Preber. This is a straight-up, manifest way to get the evidence case on both the accident and the causation issues, and we would ask that the court affirm it in its entirety. Thank you. Thank you, counsel, for your argument on this matter. Counsel, you may reply. Too much stuff. All right. Just briefly, with respect to the issue of causation, one thing that I did not mention to you earlier that I think is significant because I think that the issue of accident, I think the commission wrongly decided that issue pretty clearly. I think that the poor lighting constituted a hazard, even if you don't find that she slipped on the piece of paper. So I think that that decision needs to be in my client's favor with respect to accident. So with respect to causation, once you get over the accident hurdle, even if you don't think that the amputation was related to the initial ankle sprain, which I obviously think that the evidence does support that, but even if you don't, what I would point out to you is that Dr. Krause agrees not only that she had the ankle sprain that was related to the injury at work, but that she also developed the DVT as a result of the ankle sprain. He said that that was a factor in the development of that condition. So I think that, at the very least, those two things should be compensable and found in my client's favor. And I think, again, the their opinions and their conclusions in this case were simply not supported by what the evidence has to say. So unless you have any questions for me, I think that's all I have. I don't believe there are. Thank you very much. Thank you, counsel. Thank you, counsel, both for your arguments in this matter. We'll be taking them to advisement and a written disposition shall issue.